**Warren ERNEY and Linda Erney, Plaintiffs–Appellants,**

v.

**Phillip FREEMAN d/b/a Phil's Custom Construction, Defendant–Respondent.**

No. 24610.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 19, 2002.

James R. Cox, of Springfield, MO, for Plaintiffs–Appellants.

No brief filed by Respondent.

JAMES K. PREWITT, Presiding Judge.

Warren and Linda Erney, as owners, and Phillip Freeman, as contractor, entered into a contract to finish the basement in the Erneys' house. The Erneys contended that Freeman breached the contract by exercising poor workmanship, including the improper installation of insulation and portions of the electrical system. Freeman filed a counterclaim, alleging that the Erneys breached the contract by refusing to allow him to complete the work. Following non-jury trial, judgment was entered in favor of Freeman on the Erneys' breach of contract claim and in favor of the Erneys on Freeman's counterclaim. The Erneys appeal.[1]

Under appellate review of a nonjury case, the trial court's judgment is affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Schaefer v. Rivers*, 965 S.W.2d 954, 956 (Mo.App. 1998). We presume that the trial court's judgment is valid; it is the Erneys' burden, as appellants, to demonstrate any error. *Id.* Due deference is given to the trial court to judge the credibility of the witnesses. *Id.*

We consider that all fact issues upon which no findings were made were found in accordance with the result reached. *Id.* Therefore, the judgment will be upheld on any reasonable theory that is supported by the evidence. *Id.*

The Erneys and Freeman entered into a contract on December 30, 1998 to finish the basement in the Erneys' home, to include the building of a bedroom, office area, and bathroom. The contract stipulated that "[e]lectrical, plumbing[,] along with all phases of the job[,] will be done to federal [and] local codes." Although the proposal submitted by Freeman for the project indicated that insulation would be installed behind all framed walls, the contract called for drywall to be hung with one-inch insulation installed around all exterior walls. The contract included an express warranty for one year after the job

---

1. Freeman has not filed a respondent's brief. Although no penalty is imposed on him and we will proceed to review the case on its merits, his failure to file a brief does leave us dependent on the Erneys' presentation and our own research. *B.J.H. v. L.H.*, 779 S.W.2d 777, 778 (Mo.App.1989). Freeman also filed a third-party petition against one of his subcontractors, Lane Baugh. Judgment was entered in favor of Baugh on that claim; however, there are no issues related to that portion of the judgment in this appeal and it will not be further discussed.

was complete and the Erneys "are unmistakable [sic] happy with the basement."

The final contract price was $32,872, which the Erneys' agreed to pay in three payments, each of which equaled approximately one-third of the total. The contract provided that the first payment would be made prior to the beginning of any work, the second after the dry wall was hung, and the third "when all phases are complete [and the Erneys] are content [and] happy." The first payment, in the amount of $10,474, was made by check on January 30, 1999. On March 5, 1999, the Erneys made the second payment to Freeman, also by check for $10,474, even though the drywall had not yet been hung.

Also in March, Freeman took bids from three licensed electricians for that portion of the project. While taking bids from the electricians, Freeman was made aware by all three that there was a problem with the existing electrical panel box because, according to the plans, it would be in the bathroom, which is prohibited by the National Electrical Code (NEC). Jack Norton, one of those three electricians, submitted a bid of $4,568 that included $800 to $1,000 to move the panel.

According to Freeman, prior to hiring the electrical subcontractor, he informed Mrs. Erney of the problem and that the approximate cost to move the existing panel would be $5,000. He claimed that she vetoed moving either the box or the bathroom because of the cost. The Erneys denied that Freeman ever discussed the situation with them. Neither Norton nor the other licensed electricians who submitted bids, and informed Freeman of the problem, were hired as the electrical subcontractor. Rather, Freeman's brother did the electrical work, which not only included keeping the existing panel in the

bathroom, but also installing a sub-panel there. Freeman paid him $1,675 for the work.

Lane Baugh, another subcontractor hired by Freeman, began hanging sheetrock during the first week of May. According to Baugh, he was only hired by Freeman to hang the sheetrock; Freeman was to install the insulation. Although Baugh knew it was common procedure not to hang the drywall without first insulating the walls, he began constructing the sheetrock walls even though the only insulation was on the walls "up against the concrete." Baugh testified that Freeman told him "not to worry about it[,]" that "there was to be no insulation" on the other walls.

Baugh encountered other problems while hanging the drywall, including studs made of low-grade lumber that were not aligned correctly or spaced the standard 16 or 18 inches apart. In addition, Baugh moved some of the electrical boxes because they were either too far in or too far out, which would cause the sheetrock to break.

Mrs. Erney approached Baugh while he was working and asked him why the insulation was not in the walls, and Baugh informed her that Freeman instructed him to hang the sheetrock without insulating first. Mrs. Erney told Baugh to cease working on the walls until she was able to speak with her son. The Erneys' son ("Brad") did inspect the walls at his mother's request and he contacted Freeman, who told him that the walls were insulated.[2]

According to Baugh, Freeman called him the next day to inquire about what had happened and then asked him to lie to Mrs. Erney and tell her that his comments regarding Freeman's instructions to him

**2.** For simplicity, the Erneys' son will be referred to in this opinion as Brad, which apparently is the name by which he is known. We mean no disrespect.

were incorrect. The next time Baugh saw Freeman at the house, Freeman was ripping off the sheetrock and attempting "to stick insulation down into the walls." This was corroborated by Brad, who testified that he received a call from his mother that Freeman was taking down the sheetrock. Apparently Mrs. Erney, who was not home at the time, but had been notified by a neighbor of Freeman's actions, asked the neighbor to tell Freeman to leave the premises.

Over the next couple of days, Freeman paid Baugh, asked him to sign a lien waiver, and fired him as a subcontractor. Also during that time period, Brad spoke with both Freeman and Baugh. Brad was attempting to facilitate a meeting between his parents, Freeman, and Baugh to discuss the problems. During a conversation with Baugh regarding the insulation problem, Baugh mentioned that it was a violation of federal code (apparently the NEC) for the electrical panel box to be in the bathroom, which Brad testified he already knew based on earlier discussions he had with two electricians.[3]

When Mr. Erney returned from out-of-town, Mrs. Erney informed him of the problems with the insulation and electrical system. On May 8, 1999, a meeting took place at the Erneys' home. In addition to the Erneys, those present included Brad and Freeman. Freeman offered to fix the problems that were of concern to the Erneys.

All parties agree that Mr. Erney presented Freeman with two options at the meeting. The first was to allow Freeman to stay on the project as the main contractor, but the Erneys would select the subcontractors for the electrical and drywall/insulation work. The Erneys wanted Norton and Baugh as the electrical and drywall/insulation subcontractors, respectively. Freeman testified that he understood the first option to mean that the Erneys would have authority to select all of the remaining subcontractors, not just Norton and Baugh.

The second option was for Freeman to return the second payment, "call it even, [and] go our separate ways." There was no dispute that Freeman's response was an emphatic no, which he followed by walking away and leaving the premises. He never returned to the project.

The Erneys hired Baugh as a subcontractor and paid him $3,219 to install insulation, hang drywall, and paint. Norton was hired as the electrical subcontractor. In addition to the NEC violation associated with the panel box in the bathroom, Norton found and corrected two other violations, included a lack of romex wire supports and lack of grounding of the metal boxes connected to the romex. For the electrical work, Norton was paid $4,618.

The Erneys presented evidence showing that they paid a total of $22,919.66 to complete the project. Thus, taking that amount plus the two payments to Freeman, which totaled $20,948, the Erneys sought damages in the amount of $10,995.66, which was the amount over the original contract price that they paid for the total project. Freeman filed a counterclaim alleging that the Erneys breached the contract by refusing to allow him to complete the project and sought damages of $10,800 or the amount to complete the contract.

The case was tried without a jury on June 28, 2001 and judgment entered on

---

3. The record is unclear as to when those discussions took place, although Brad apparently had an interest in the area because he had asked Freeman earlier whom he intended to hire as the electrical subcontractor.

July 16, 2001. The trial court found in favor of Freeman on the Erneys' breach of contract claim. Although the trial court found that Freeman had not properly installed the electrical system, did not install insulation prior to hanging drywall, and did not properly install suitable framing, the trial court entered judgment in his favor because the Erneys did not give him an opportunity to correct the problems at his own expense and complete the project. On Freeman's counterclaim, the trial court ruled in favor of the Erneys, finding that when they presented Freeman with the two options, he rejected both of them and walked away from the project. The trial court also determined that Freeman had been adequately compensated for the work that he did complete. This appeal by the Erneys followed.

In their first point on appeal, the Erneys claim that the trial court erred in denying them any award on their breach of contract claim. They contend that the basis of the trial court's denial was that they had refused to give Freeman an opportunity to correct the problems at his own expense and complete the project. The Erneys argue that denying them an award on that basis was not based on substantial evidence. They claim that their actions in restricting Freeman's work on the remainder of the contract was justified because he had materially breached the contract. They further contend that Freeman abandoned the contract and the contract did not contain a "right to cure" provision.

■■ It is well established that if a contractor is prevented from completing the work on a construction project by the actions of the owners, the owners have breached the contract. *Statler Mfg., Inc. v. Brown*, 691 S.W.2d 445, 448 (Mo.App. 1985). If the work has been partially completed at the time of the owners' actions, the contractor is excused from his contrac-

tual obligations and may cease work on the project. *Id.* at 449. His failure to complete the work is excused and he has not breached the contract. *Diversified Metal Fabricators, Inc. v. Blue Skies, Inc.*, 899 S.W.2d 556, 563 (Mo.App.1995). When the owners prevent the contractor from performing work on the contract, the contractor may either sue on the express contract or on quantum meruit for the value of the labor and materials the contractor has furnished. *Statler Mfg.*, 691 S.W.2d at 449.

■■ However, it is necessary to determine which, if any, party breached by considering whether the contractor's failure to complete the project, or his ceasing of the work, was due to actions of the owners that prevented him from completing the work (prevention) or to voluntary actions of the contractor of walking away from the project (abandonment). *See Curators of University of Missouri ex rel. Shell–Con, Inc. v. Nebraska Prestressed Concrete Co.*, 526 S.W.2d 903, 907–08 (Mo. App.1975). The contractor has the burden of proving that the owners breached by preventing the contractor from completing the work and the owners have the burden of proving that the contractor breached by abandoning the contract and voluntarily failing to complete the work. *Id.* at 911. For a finding of abandonment, a party's action must be clear and unequivocal. *See Slone v. Purina Mills, Inc.*, 927 S.W.2d 358, 369 (Mo.App.1996).

Here, a vital component in the above determination is the consideration of what took place before what Freeman claims was prevention and what the Erneys claim was abandonment. The trial court found that Freeman did not properly install the electrical system, did not install insulation prior to hanging drywall, and did not properly install suitable framing.

The contract contains an express warranty under which Freeman agreed to

warranty "all work for one full year after job is complete [and the Erneys] are unmistakable [sic] happy with the basement." In addition, the third payment was contingent upon all phases being complete and the Erneys being "content [and] happy." Freeman also agreed in the contract to comply with all local and federal codes relating to the electrical work. At some point following the disbursement of the second payment, the Erneys became less than content and happy with the basement, particularly the workmanship related to the installation of the insulation, drywall, and electrical system. They also determined that portions of the electrical system were not in compliance with the NEC.

As noted in the judgment, substantial evidence was presented that Freeman's work related to the insulation and electrical system was completed improperly and in such a manner that it was necessary to correct and repair in order to complete the project. In addition, Freeman agreed that he was fully aware of the NEC violations.

His response was that the electrical panel in the bathroom was an existing panel and that since the county in which the Erneys lived had not adopted the NEC, he assumed this project would be exempt from compliance. However, Norton testified that all licensed electricians,˙ whether working in a city or county that has adopted the code or not, are required to follow the code. Freeman also testified that he was aware that the Erneys wanted a licensed electrician to do the job.

Whether considering the express one-year warranty of his work, the satisfaction provision upon which the last payment was contingent, or the provision under which all electrical work would be completed in compliance with all federal and local codes, we find that Freeman breached the contract. "When a contract is contingent on one of the parties' satisfaction, the party must exercise judgment in good faith and as a reasonable person—not arbitrarily without a *bona fide* reason for his or her dissatisfaction." *Campbell v. Shaw*, 947 S.W.2d 128, 131 (Mo.App.1997). We find that the Erneys did have a *bona fide* reason for their dissatisfaction and expressed that dissatisfaction in a manner that was reasonable and in good faith. *Id.*

If a breach is material, the injured party may rescind or cancel the contract, and that party's performance may be excused. *See Harris v. Desisto*, 932 S.W.2d 435, 446 (Mo.App.1996); *see also Campbell*, 947 S.W.2d at 132. If the breach is not material, a party may not cancel the contract, but may pursue other remedies. *Campbell*, 947 S.W.2d at 131. In the case at bar, the Erneys sued for damages and not to rescind the contract. They sued in order to recoup damages for Freeman's imperfect performance. Thus, having found that Freeman breached the contract, we need not address whether the breach was material to resolve the issues on appeal. *See Health Related Services, Inc. v. Golden Plains Convalescent Center, Inc.*, 806 S.W.2d 102, 104–05 (Mo.App.1991).

After Freeman breached, the Erneys were within their rights to discuss the problems with him and to attempt to seek a resolution to the problems. We agree with the characterization of Freeman's actions after the Erneys presented him with the two options that the trial court used in connection with the counterclaim, that he rejected both options and walked away from the contract. Given that his response to the options included an emphatic and profanity-based no and he followed that comment by leaving the premises, never returning to complete the project, we find that his conduct was clear and unequivocal enough to be termed abandonment of the contract. *See Slone,*

927 S.W.2d at 369. Therefore, the Erneys actions did not constitute the prevention of Freeman's completion of the project.

■ Given the above analysis and our finding that Freeman breached the contract and then abandoned it by walking away from the project and refusing both of the options presented to him to cure the defects, the Erneys' first point has merit. It is not necessary to discuss whether the Erneys were required to provide a right to cure, other than to note that where the contract does not include a provision for the right to cure, as was the situation here, giving the contractor an opportunity to repair or correct the defects is not necessary prior to the filing of a lawsuit for breach of contract. *Dynacon Builders v. Janowitz*, 892 S.W.2d 807, 810 (Mo.App. 1995). However, it is necessary to discuss damages.

■ Where there has been part performance on a construction contract, the owners' measure of damages is generally the cost of completion. *F.C. Preuitt Const. Co., Inc. v. Doty*, 536 S.W.2d 908, 915 (Mo.App.1976). The only exception is where the cost of completion or repair would cause economic waste; then the proper measure of damages is the diminution of value. *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 527 (Mo.App. 1998). However, it would be Freeman's burden to present evidence that the cost of repair method is disproportionate to the diminution in value, and he presented no such evidence. *Id.*

■ When a breach results from a combination of defective construction and a failure to complete the work, the owners' damages are calculated using the reasonable cost of reconstruction, repair, and completion in accordance with the contract. *Edmonds v. Stratton*, 457 S.W.2d 228, 233 (Mo.App.1970). In the case at

bar, the final contract price was $32,872. The Erneys paid Freeman $20,948 and presented evidence that they paid $22,919.66 to complete the project. Thus, given Freeman's breach by defective construction and his subsequent failure to complete the project because he rejected the options for completion and walked away from the project, the Erneys are entitled to a damage award in the amount of $10,995.66.

As the Erneys' first point is dispositive, we need not address their second point, which focuses on the lack of damage award for the Erneys and claims that Freeman was allowed to retain too much of the money paid to him.

The portion of the judgment related to the Erneys' petition is reversed. The cause is remanded to the trial court with directions to enter judgment in favor of the Erneys on their petition and award them damages of $10,995.66. In all other respects, the judgment is affirmed.

PARRISH, Judge, and MAUS, Senior Judge, concur.