FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

August 15, 2011

**UNITED STATES COURT OF APPEALS**

Elisabeth A. Shumaker
Clerk of Court

**TENTH CIRCUIT**

LARRY SNYDER AND COMPANY,

     Plaintiff-Appellant,

v.

     No. 10-5045

CLARK MILLER, D/B/A AMERICAN
UNDERGROUND UTILITIES,

     Defendant-Appellee.

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 07-CV-455-PJC)**

Thomas W. Millington of Millington, Glass and Love, Springfield, Missouri, for
Plaintiff-Appellant.

Roger N. Butler (Jennifer L. Struble with him on the brief), of Secrest, Hill, Butler and
Secrest, Tulsa, Oklahoma, for Defendant-Appellee.

Before **KELLY, EBEL,** and **GORSUCH,** Circuit Judges.

**EBEL**, Circuit Judge.

In this appeal, Plaintiff–Appellant Larry Snyder and Company (Snyder) argues that the district court erred by granting summary judgment to Defendant–Appellee Clark Miller, doing business as American Underground Utilities (Miller), on Snyder's breach of contract claim. Snyder and Miller entered into a subcontract agreement, under which Miller would install utility trenches underneath what would become a parking lot for an apartment complex. Miller performed the work, but once the asphalt for the parking lot was installed, the trenches settled and the parking lot was damaged. Snyder requested that Miller repair the entire parking lot, but Miller refused, arguing that the subcontract only required it to repair the areas of the parking lot that actually settled.

We agree with the district court that the subcontract unambiguously governed the extent of the repair required of Miller. Accordingly, no genuine issue of material fact exists concerning Miller's liability for repair work that exceeded the requirements of the subcontract and summary judgment was appropriate. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. Background

Snyder entered into an agreement with the Housing Authority of the Osage Tribe (Osage), under which Snyder agreed to be the general contractor on the Stoneridge Estates apartment complex. In the contract between Snyder and Osage, Osage required every subcontract to have the following "flow-through" clause:

> Contractor shall include with every Subcontractor agreement the following language: Subcontractor binds itself to Contractor and Owner and is obligated to Contractor and Owner in the same manner and to the same

2

extent that Contractor is bound and obligated to Owner under the Prime Contract. All rights which Owner may exercise and enforce against Contractor may be exercised and enforced by Contractor against Subcontractor, in the event of any dispute between the Owner and Contractor. Subcontractor shall be bound by all decisions, directives, interpretation[s] and rulings of the owner or the Architect, at Owner[']s option, including Owner's termination or suspension of Contractors.

(Aplt. App., vol. I at 91.)

Snyder then entered into a subcontract agreement with Miller, under which Miller agreed to install utility trenches underneath what would become a parking lot for the apartment complex. Snyder's subcontract with Miller contained the language of the flow-through clause as specified in the contract between Snyder and Osage. The subcontract also contained the following provision explaining Miller's responsibilities:

Responsible for all bedding and compaction of trenches per contract documents, city requirements and the geotechnical report. This to include 18" minimum of crushed stone base material placed in 8" lifts in all utility and storm sewer trenches under areas receiving paving per plans. All trenches to be compacted to 95% per contract documents. In the event that settlement or failure should occur under parking lots, sidewalks, curb and gutter, and landscaped areas resulting in damage to other trades work, this subcontractor is responsible to remove the damaged area, acquire proper compaction and replace area at this subcontractor's expense.

(Id. at 59 (emphasis added).) We will refer to the last clause in that provision as the repair clause.

Miller excavated, filled, and compacted the trenches, and then another subcontractor installed the asphalt for the parking lot. After the installation of the parking lot asphalt, the trenches settled, resulting in damage to the parking lot.

3

Miller's engineers, Standard Testing and Engineering Company, inspected the settled areas and recommended that "[t]he asphalt in the paved areas . . . be cut back so that it is wider than the trench (over cut) by two feet on each side before repaving." (Id. at 219.) Osage, relying on the recommendation of its engineers, Kaw Valley Engineering, instead insisted that Miller repair the entire parking lot, not just the damaged areas. So after conferring with Osage, Snyder sent a letter to Miller requesting eight repairs: (1) set up traffic control and coordinate phasing with Osage and Snyder, (2) sawcut and remove asphalt paving in the marked areas, (3) sawcut and remove the curb and gutter that are marked, (4) excavate the trenches and backfill the material with flowable fill up to the bottom of the asphalt paving, (5) form and place the curb and gutter, (6) mill the top 1 ½" of asphalt and repair the entire parking lot, (7) re-strip the entire parking lot, and (8) remove all excess demolished material and clean-up.

Miller agreed to make most of the repairs requested except for (6) mill the top 1 ½" of asphalt and repair the entire parking lot and (7) re-strip the entire parking lot. Miller continued to refuse to perform those two repairs, and so Snyder contracted with another subcontractor to perform all of the repairs requested.

Miller filed suit against Snyder for damages arising out of a contract dispute on a related project. Then, Snyder filed a counterclaim for breach of contract regarding Miller's failure to repair the trenches, seeking $295,352.92, the damages incurred in repairing the entire parking lot. The parties stipulated to the amount of payment due on

4

the related project, so those claims were dismissed by Miller. Then, the district court realigned the parties with Snyder as plaintiff and Miller as defendant.

After discovery, both Snyder and Miller filed motions for summary judgment. The district court entered an order on December 30, 2009, granting summary judgment in favor of Miller. Then, Snyder filed a motion to reconsider. The district court issued a new order on March 2, 2010, but it reached the same conclusion. Snyder timely appealed.

## II.  Discussion

We review the district court's grant of summary judgment de novo. Evers v. Regents of Univ. of Colo., 509 F.3d 1304, 1308 (10th Cir. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

According to the subcontract, Missouri law governs this case. Under Missouri law, a contract is ambiguous only if its terms are susceptible to fair and honest differences. Eisenberg v. Redd, 38 S.W.3d 409, 411 (Mo. 2001) (en banc). "In contractual interpretation, the primary rule is to ascertain the intent of the parties and then give effect to that intent. When there is no ambiguity in the contract, the intent of the parties is to be gathered from [the contract] alone." Lueckenotte v. Lueckenotte, 34 S.W.3d 387, 395 (Mo. 2001) (en banc) (per curiam) (alteration in original). "Courts presume that the words used are intended to have their natural and ordinary meaning." Id. Further, courts should construe each term of a contract to avoid rendering other terms

meaningless. City of Harrisonville v. Pub. Water Supply Dist. No. 9, 49 S.W.3d 225, 231 (Mo. Ct. App. 2001). So courts prefer a construction that attributes a reasonable meaning to all the provisions of the agreement to one that leaves some of the provisions without function or sense. Id.

Snyder argues that, according to the unambiguous contract language, Miller was bound by Osage's decision that the damaged area was the entire parking lot. In making this argument, Snyder relies on the flow-through clause, which binds Miller to all decisions, directives, interpretations, and rulings of Osage, as well as the following language in the subcontract:

> SUBCONTRACTOR agrees to be bound to the CONTRACTOR and conditions of the CONTRACT DOCUMENTS to the same extent as the CONTRACTOR is bound to the OWNER. . . . All work performed under this Agreement and CONTRACT DOCUMENTS shall be completed to the full satisfaction of the OWNER, ARCHITECT, and CONTRACTOR.

(Aplt. App., vol. I at 57 (emphasis added).) We will refer to this provision as the full-satisfaction clause. Snyder contends that the district court's order overlooks these contract provisions and renders them meaningless. According to Snyder, these provisions show that Osage "had the final say on the scope and extent of repair and remediation." (Aplt. B. at 24.) Therefore, when Osage determined that repair of the entire parking lot was necessary, the subcontract required Miller to repair the entire parking lot.

Miller, however, argues that Snyder's interpretation renders the repair clause meaningless because Snyder demands repairs, relying on the flow-through and full-

6

satisfaction clauses, which exceed those contemplated in the repair clause. Miller contends that all of these provisions should be interpreted consistently with each other, with the repair clause limiting Miller's obligation to repair only the damaged area, or the area where the trenches settled, not the entire parking lot.

Finally, Snyder responds that the district court and Miller's interpretation incorrectly elevates more specific contractual terms over more general terms. "The rule of contractual interpretation that specific words take precedence over general words applies only where there is an inconsistency or ambiguity in the language of the agreement." Frager v. Frager, 949 S.W.2d 173, 177 (Mo. Ct. App. 1997). Because, Snyder argues, both parties and the district court agreed that no ambiguity exists in the subcontract, the district court should not have elevated the more specific words of the repair clause over the more general words of the flow-through and full-satisfaction clauses.

First, we must determine whether an ambiguity exists in the subcontract between Snyder and Miller. Reading the natural and ordinary language of the agreement, we do not find that the terms are susceptible to fair and honest differences. None of the terms are duplicitous, indistinctive, or uncertain. See Rodriguez v. Gen. Accident Ins. Co., 808 S.W.2d 379, 382 (Mo. 1991) (en banc) ("An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract."). Further, both parties agree that the terms of the agreement are not ambiguous. Therefore, we must next ascertain the intent of the parties from the language of the contract.

7

In interpreting the subcontract, we seek to avoid any interpretation that renders a provision meaningless. See City of Harrisonville, 49 S.W.3d at 231. The provisions at issue in this case can be interpreted to produce harmony and meaningfulness between the repair, full-satisfaction, and flow-through clauses. Under the repair clause of the subcontract, Snyder and Miller manifested their intent concerning how Miller should repair damaged area in the event that settlement occurred under the parking lot: "In the event that settlement or failure should occur under parking lots, . . . [Miller] is responsible to remove the damaged area, acquire proper compaction and replace area at [Miller's] expense." (Aplt. App., vol. I at 59.) The full-satisfaction clause simply ensures that the repair work completed according to the repair clause was performed to the full satisfaction of Snyder and Osage, though the satisfaction of Snyder and Osage must be reasonably anchored within the contract taking fair account of all of its provisions. See Erney v. Freeman, 84 S.W.3d 529, 535 (Mo. Ct. App. 2002) ("When a contract is contingent on one of the parties' satisfaction, the party must exercise judgment in good faith and as a reasonable person—not arbitrarily without a bona fide reason for his or her dissatisfaction."); Burns v. Reis, 191 S.W. 1096, 1098–99 (Mo. Ct. App. 1917) ("[W]here the thing to be done under a contract does not pertain to articles of taste or fancy, and it is stipulated that it shall be done to the satisfaction of one of the contracting parties, the party to be satisfied cannot act arbitrarily or capriciously in the matter, and . . . the law will say that he is satisfied with that which a contracting party under the circumstances ought to be satisfied."). The flow-through clause does not purport to

8

abrogate other provisions of the contract. Although it binds Miller to the decisions of Osage, such decisions must be reasonable and faithful to the terms of the entire contract. Cf. 13 Am. Jur. 2d Building and Construction Contracts § 34 (2011) ("One who has performed work under a building or construction contract conditioning the obligation to pay for the work upon the owner's satisfaction with it is entitled to recover, as against the owner's claim of dissatisfaction, if the work performed is such that a reasonable person would be satisfied by it; in these cases, the owner's satisfaction is determined by objective criteria."). This interpretation does not elevate the specific repair clause over the general flow-through and full-satisfaction clauses, as Snyder argues, but instead places equal emphasis on all three. We prefer this construction because it attributes a reasonable meaning to all three provisions instead of leaving one or some of the provisions without function or sense.

If we gave controlling effect to the flow-through clause but not the repair clause as Snyder desires, then we would render the repair clause meaningless. Such an action would be contrary to the well-established principle that a construction that would render a provision meaningless should be avoided. Therefore, we reject Snyder's interpretation and instead interpret the provisions of the subcontract in harmony: the repair clause limits Miller's obligation to repair only those areas of the parking lot that settled, and the flow-through and full-satisfaction clauses ensure that Miller performs those repairs to the

9

satisfaction of Osage and Snyder.[1]

---

[1] We note that one provision of the contract between Snyder and Osage, incorporated into the subcontract by reference provides as follows:

> The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

(Aplt. App., vol. I at 136.) One could argue that this provision requires repair of the entire parking lot because repairing only the areas where the trenches settled would leave the entire lot damaged. But Snyder failed to adequately raise that argument in its brief. This provision is cited twice without any argument or explanation and not referenced again until oral argument. Therefore, we need not decide whether this provision applies in this case. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995) (explaining that issues not adequately briefed will not be considered on appeal even when a party attempts to assert those claims at oral argument).

In any event, in light of the other provisions in this contract, we would likely find this argument to be unpersuasive even if raised on the record before us. The only evidence in the record before us that supports this argument is the following statement of Kaw Valley Engineering:

> While the repair recommended by the contractors materials testing laboratory will remedy the areas that have failed, it is the opinion of Kaw Valley Engineering that a remedied parking lot will not perform as well as a new parking lot. The saw cut edges throughout the parking lot will provide conduits for water infiltration to the pavement subgrade. Once water reaches the subgrade, failure of the pavement will be imminent. Kaw Valley Engineering believes that the Housing Authority of the Osage Tribe paid for a new parking lot with the project, and that is what they deserve.

(Aplt. App., vol. II at 416–17.) But that statement does not convince us that Miller should bear the cost of replacing the entire parking lot for two reasons. First, Kaw Valley does not support this conclusory allegation with any evidence or testing showing that saw cut edges will provide conduits for water infiltration. See Ford v. West, 222 F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice to create a genuine

Continued . . .

10

Snyder sought the full damages sustained in repairing the entire parking lot. But the repair clause limits Miller's obligation to repair only the damaged areas where the trenches settled. Because the subcontract's repair clause governed the repairs required of Miller, there is no genuine issue of material fact concerning Miller's liability for repair work that exceeded those requirements. Therefore, summary judgment was appropriate, and the district court did not err by granting summary judgment to Miller.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment in favor of Miller.

---

Cont.

issue of material fact."). Second, in the same breath that Kaw Valley claims that the entire parking lot needs to be resurfaced, Kaw Valley also concedes that repairing only the settled areas "will remedy the areas that have failed." The repair clause only required Miller to remedy the areas that failed, and Miller offered to do just that. We cannot say based on this clause that the contract required Miller to do any more.

11